UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| BILL YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 99-BU-3255-M |
| | ) | |
| CITY OF HENAGER, ALABAMA; WILLIAM B. BOWMAN, an individual; and DARWIN BLACKWELL, an individual, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**

FEB 09 2001

## Memorandum Opinion

In his complaint in the above-styled action, Plaintiff Bill Young claims that Defendants City of Henagar, Alabama ("City"); William B. Bowman, a police officer for the City; and Defendant Darwin Blackwell are liable under 42 U.S.C. § 1983 for violations of Plaintiff's federal constitutional rights and under Alabama state tort law, based on allegations that Plaintiff was arrested without probable cause, that his automobile was illegally searched, and that he was subjected to excessive force during the course of his arrest. Now before the Court is a motion for summary judgment filed jointly by Bowman and the City (Doc. No. 39). Also pending are original (Doc. No. 40) and "revised" (Doc. No. 49) motions for summary judgment filed on behalf of Blackwell. Plaintiff responded to Blackwell's

55

motions for summary judgment by conceding all of his claims, state and federal, against that Defendant. See "Plaintiff's Response to Defendant Darwin Blackwell's Motion for Summary Judgment" (Doc. No. 51). In his response to the motion for summary judgment filed by Bowman and the City, Plaintiff states that he also concedes all of his state and federal claims against those two Defendants except the following:

> (1) his federal claim against Bowman for an unconstitutional use of excessive force in the course of an arrest;
>
> (2) his federal claims against the City for negligent hiring, supervision and training;
>
> (3) his state law claims against both Bowman and the City for assault and battery arising out Bowman's use of force;
>
> (4) his claims against both Bowman and the City for "negligent, careless, and unskillful arrest"; and
>
> (5) his state law claims against the City for negligent hiring, supervision and training.

See "Bill Young's Memorandum Brief in Response to Defendant's Joint Motion for Summary Judgment" (Doc. No. 52) at 12. Based on Plaintiff's concessions, the above claims are the only ones still at issue for purposes of the pending motions for summary judgment, and all other claims are due to be DISMISSED. Considering the evidence submitted and the arguments presented by the parties, the Court concludes that the motion for summary judgment filed jointly by Bowman and the City (Doc. No. 39) is due to be GRANTED IN PART AND DENIED IN PART and that Blackwell's original motion for summary judgment (Doc. No. 40) is MOOT while his "revised" motion for summary judgment (Doc. No. 49) is due to

be GRANTED in its entirety.

## I. BACKGROUND[1]

At about 9:00 p.m. on April 3, 1999, Plaintiff departed the residence of his girlfriend in Fort Payne, Alabama, where he had spent most of the day with her and their daughter. When Plaintiff left, he drove his automobile toward his home in Henagar, Alabama, where he lived with his father. Plaintiff acknowledges that between approximately 2:00 p.m. and approximately 4:30 or 5:00 p.m. that day, he drank "about" six or seven beers. He also claims, however, that he did not consume any more alcohol that evening before driving home.

When Plaintiff left Fort Payne, Defendant Bowman was on duty in his capacity as a police officer for the Defendant City. While at the Henagar police station, Bowman was given a radio dispatch bulletin originating from the DeKalb County Sheriff's Office advising police officers in several localities to be on the lookout for a drunk driver, headed from Fort Payne to Henagar. This bulletin also provided Plaintiff's name, a description of his automobile, and an address where he was thought to reside. Bowman, who had been dispatched to Plaintiff's residence previously, entered his squad car and drove to the address where Plaintiff lived with his father, in hopes of finding Plaintiff there. Riding along with Bowman on this assignment was Defendant Blackwell, a private citizen who worked for a nearby municipality's fire and rescue unit and who was also a friend of Bowman's.

Upon arriving at Plaintiff's residence, Bowman walked up onto the porch of

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

the house, leaving Blackwell in the squad car. Bowman knocked on the door and spoke with Plaintiff's 73-year-old father, who advised Bowman that Plaintiff had not arrived home. Soon thereafter, Bowman saw Plaintiff drive his car into the side driveway of the house. According to Plaintiff, Bowman, who stands approximately 6'2" and then weighed about 350 pounds, came running towards Plaintiff's vehicle "like a madman" and asked him whether he had been drinking. As he sat in the driver's seat, Plaintiff replied, "Yeah." Bowman ordered Plaintiff to get out of the vehicle, to which Plaintiff said, "Well, you know, I was planning on it." Plaintiff, who himself stands about 6'3" and then weighed about 230 pounds, exited the car, and advised Bowman that he was on private property and asked what he was doing there. Bowman explained that he had received a call about Plaintiff, and he told Plaintiff to step to the rear of the vehicle because he wanted to administer to Plaintiff a field sobriety test. Plaintiff stated that he was not refusing to take a sobriety test, but he wanted to be taken to get a breathalyzer test because he had a "bad leg" and could not take a field test.[2] Up to this point, the accounts of Plaintiff and Bowman are more-or-less consistent with each other. However, they diverge substantially with respect to events occurring immediately thereafter.

Plaintiff claims that by this time, his father had followed Bowman down towards Plaintiff's parked car. As the three men stood in a semicircle, Bowman asked Plaintiff's father what the address was there. was. Plaintiff's father gave Bowman an address, but Bowman told him that such was incorrect, because the new 911 emergency codes resulted in an address change. Plaintiff tried to tell

---

[2]That evening, Plaintiff was ultimately administered two consecutive breathalyzer tests at a police station in a nearby municipality. On those tests, Plaintiff registered .07 and .06 blood alcohol content.

Bowman the correct address, but Bowman at once wheeled around and told Plaintiff, "You shut your damn mouth. I'm not talking to you." Bowman again asked Plaintiff's father what the new address there was, but Plaintiff's father said he did not know. Plaintiff again started to tell Bowman the address, at which time Bowman allegedly responded by immediately running up to Plaintiff, grabbing him, and "slinging" him to the ground, stating, "You're under arrest." After being taken to the ground, Plaintiff was handcuffed with his arms behind his back.

By contrast, Bowman relates that after Plaintiff said he did not want to take a field sobriety test, he told Plaintiff that in order to take him for the test he was going to go ahead and arrest him anyway but he still wanted him to take a field test right then. After Plaintiff allegedly refused, Bowman claims that he asked Plaintiff several more times to take a field test, but Plaintiff would not comply. Bowman then stepped towards Plaintiff and grabbed one of his arms and told him that he was under arrest. According to Bowman, however, Plaintiff resisted and kept trying pull away from him as he took out his handcuffs. Bowman asserts that because he felt threatened and he could not simply let Plaintiff go, he "took him down with the least amount of force possible" by "tripp[ing] him up." Bowman acknowledges, though, that he was holding Plaintiff's left arm behind him when he brought Plaintiff down, which prevented Plaintiff from being able to catch himself or otherwise break his fall.

When Bowman took Plaintiff down, Plaintiff suffered injuries to his left knee and to the left side of his head, upon which he landed when he hit the ground. Because of his knee injury, Bowman and Blackwell had to carry Plaintiff to and place him in the squad car, as Plaintiff was unable to get up or walk under his own

power.  Plaintiff also received several stitches that evening to close wounds on his ear and his eyebrow.  The evidence further suggests that Plaintiff sought additional medical treatment for his knee injury and that such injury caused him to miss work "on and off" over a period of about six to eight months.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, at 323.  See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial."  Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the

nonmovant's favor. <u>Rooney v. Watson</u>, 101 F.3d 1378, 1380 (11th Cir. 1996) (<u>citing</u> <u>Hale v. Tallapoosa Co.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

III.  CONTENTIONS & ANALYSIS

### A.  The Section 1983 Claims

Section 1983 creates a civil cause of action for any person deprived of any rights, privileges, or immunities, secured by the Constitution and laws, by another person acting under color of state law. 42 U.S.C. § 1983.[3] Thus, in order to prevail, a plaintiff must demonstrate both (1) that the defendants deprived him of a right secured under the Constitution or federal law and (2) that the deprivation occurred under color of state law. <u>See</u> <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187-88 (11th Cir. 1999); <u>Arrington v. Cobb County</u>, 139 F.3d 865, 872 (11th Cir. 1998). With respect to Plaintiff's remaining claims, there is no doubt that Defendants acted under color of state law for purposes of a section 1983 claim.

1.    The Excessive Force Claim Against Bowman

Plaintiff now concedes that Bowman had probable cause to arrest him on the night in question.  Plaintiff claims, however, that Bowman is nonetheless liable

---

[3]Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." 42 U.S.C. § 1983.

under section 1983 for using excessive force in securing his arrest.  The Fourth Amendment prohibits a law enforcement officer from employing unreasonable force in the course of a lawful arrest, investigatory stop, or other "seizure" of a free citizen.  See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)).

Bowman argues that no constitutional violation occurred so as to support this claim, and he further asserts that he is entitled to qualified immunity.  "Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' "  Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "A reasonable official's awareness of the existence of an abstract right, such as a right to be free of excessive force, does not equate to knowledge that his conduct infringes the right."  Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).  Rather, "[f]or the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  Priester, 208 F.3d at 926; Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citing Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).  Thus, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."  Smith, 127 F.3d at 1419.  However, "[w]hen an excessive force plaintiff shows 'that the official's conduct lies so obviously at the very core of what the Fourth Amendment

prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw,' the official is not entitled to the defense of qualified immunity." Priester, 208 F.3d at 926 (quoting Smith, 127 F.3d at 1419).

Where a public official asserts the defense of qualified immunity, a court is generally required to first determine whether the evidence shows that Plaintiff's constitutional rights were violated before inquiring into whether the right implicated was clearly established at the time of the events in question. See Hudson v. Hall, 231 F.3d 1289, 2001 WL 58739, *1 (11th Cir. 2001) (citing Wilson v. Layne, 526 U.S. 603 (1999)). Whether the force used by a law enforcement officer is unreasonable for purposes of the Fourth Amendment is determined using a wholly objective standard that does not implicate an inquiry into the subjective motives of the officer. See Graham, 490 U.S. at 397. The analysis is performed from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." and requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. This calculus also embodies an "allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 397. Thus, " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." Id., at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973)). Similarly, the Eleventh Circuit Court of Appeals has established the principle that,

where an officer may lawfully make an arrest, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin, 207 F.3d at 1257.

The Court concludes that Plaintiff has presented substantial evidence that, if credited, would allow a jury to reasonably infer that Bowman violated the Fourth Amendment by using an objectively unreasonable amount of force in securing Plaintiff's arrest. Bowman suggests that Plaintiff was belligerent and resisted arrest while he, Bowman, merely "tripped" Plaintiff to bring him down, using the least amount of force he could to do so. However, the version of events suggested by Plaintiff is in sharp contrast, and on a motion for summary judgment the evidence must be viewed in the light most favorable to the non-movant.[4] See Priester, 208 F.3d at 924; Roberts v. Marino, 656 F.2d 1112, 1114-15 (5th Cir. Unit A September 21, 1981).[5] Plaintiff claims that as he stood before Bowman and simply attempted to provide him with the information Bowman sought about Plaintiff's changed home address, Bowman without justification grabbed him and commenced "slinging" him to the ground. Plaintiff denies that he resisted or attempted to flee prior to being thus taken down or that he otherwise represented an immediate

---

[4]Defendants have also submitted an affidavit from Bill Myers purporting to constitute expert testimony to show that Bowman did not use excessive force. However, it is clear that Myers has credited Bowman's version of events, at least partially, as Myers indicates that his opinion is based on an assumption that Plaintiff resisted arrest and that such justified Bowman's use of force in taking Plaintiff down. While a jury might find that Plaintiff did indeed resist arrest, as Bowman claims, Plaintiff's testimony is that he did not resist arrest prior to being put to the ground by Bowman.

[5]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

threat to safety. Nor is there any suggestion that Plaintiff was accused of a violent or serious crime that could justify the use of force alleged. Bowman's allegedly unprovoked attack, Plaintiff claims, caused him to suffer a knee injury that prevented him from being able to walk that night and kept him out of work "on and off" for up to eight months. It is also undisputed that Plaintiff suffered cuts to his ear and face that required stitches as a result his being taken down. Therefore, the Court further concludes that there is sufficient evidence to indicate that neither the force employed nor the injuries sustained here were so minor as to be considered de minimis, as distinguished from <u>Nolin</u> and the cases cited therein. Accordingly, the Court concludes that Bowman is not entitled to summary judgment on this claim on the basis that no Fourth Amendment violation occurred. <u>See, e.g.</u>, <u>Sheth v. Webster</u>, 145 F.3d 1231, 1238 (11th Cir. 1998); <u>Thornton v. City of Macon</u>, 132 F.3d 1395, 1400 (11th Cir. 1998); <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir. 1997); <u>Popham v. City of Kennesaw</u>, 820 F.2d 1570, 1577 (11th Cir. 1987).

The Court similarly concludes that Bowman is not entitled to the defense of qualified immunity on Plaintiff's excessive force claim. Plaintiff's testimony suggests that the amount of force allegedly used by Bowman in this case was wholly unjustified and utterly unnecessary to secure the arrest. Given the cases cited above finding sufficient evidence to sustain a finding of excessive force in violation of the Fourth Amendment where serious injuries resulted to arrestees who, like Plaintiff, allegedly neither resisted arrest, were accused of a serious crime, nor represented an immediate threat to safety of the officer or others, the Court concludes that it was clearly established on April 3, 1999 that Bowman's alleged conduct violated the

Fourth Amendment. The Court further determines that it was also readily apparent that Bowman's alleged conduct falls within the very core of what the Fourth Amendment prohibits, so as to preclude a qualified immunity defense. Summary judgment on Plaintiff's section 1983 excessive force claim against Bowman is due to be denied.

### 2.   The Federal Claims Against the City

Plaintiff also asserts that the City is liable under section 1983 for Bowman's use of allegedly excessive force. It is well established that a municipality may not be held liable under section 1983 pursuant to a theory of respondeat superior. See Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978). Instead, a municipality may be held liable for the actions of a police officer only when municipal "official policy" or "custom" causes a constitutional violation. See id. at 694-95. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989). Thus, Plaintiff must "identify a municipal 'policy' or 'custom' that caused [his] injury," Board of County Com'rs v. Brown, 520 U.S. 397, 403 (1997). However, it is not enough for a section 1983 plaintiff merely to identify conduct properly attributable to the municipality; he or she "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the [constitutional] injury alleged." Id. at 404 (emphasis original).

### a.   Hiring and Background Screening

Plaintiff first claims that the City is liable under section 1983 because the City inadequately screened Bowman's background before it hired him, which caused the

City to be unaware that he was served several written warnings for improper conduct while he was employed as a jailer for the DeKalb County Sheriff's Department. In particular, Plaintiff highlights that the City hired Plaintiff without becoming aware that he had been cited with two written warnings on or about May 22 and July 16, 1997, for improperly spraying inmates with pepper spray while the inmates were locked in their cells.

Plaintiff does not contend that any action or decision of the City with respect to the hiring of Bowman or its failure to adequately investigate his background is itself violative of the constitution or federal law. Where a plaintiff seeks to establish municipal liability under section 1983 on the theory that a facially lawful municipal action has led an employee to violate his rights, the plaintiff must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious risk that a violation of a particular constitutional or statutory right will follow the decision. Brown, 520 U.S. at 410-11; Harris, 489 U.S. at 388  To establish such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to take action in a particular area based on a pattern of constitutional violations and made a deliberate choice not to take any action, or that the need to take action in a particular area in issue was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for a single incident. See Harris, 489 U.S. at 388-90; Young v. City of Augusta, Ga. Through DeVaney, 59 F.3d 1160, 1172 (11th Cir. 1995). Thus, "[a] showing of simple or even heightened negligence will not suffice." Brown, 520 U.S. at 407.

The record shows that Plaintiff cannot prove the requisite "deliberate

indifference" on the part of a City policymaker so as to allow for recovery against the City based on its allegedly inadequate screening of Bowman's background or its decision to hire Bowman. Plaintiff has not produced any evidence or even alleged that the City's hiring practices have resulted in a pattern of constitutional violations so as to put City policymakers on notice that its hiring or screening procedures were inadequate to filter out those who were inclined to employ excessive force or were highly likely to result in the deprivation of the constitutional right alleged by Plaintiff. Nor can it be said that the actions of municipal decision-makers with respect to the pre-hire screening of Bowman in particular indicated the high degree of culpability required to impose municipal liability under section 1983. Robert Trotman, the City's Chief of Police at the time of Bowman's hiring and upon whose recommendation Bowman was ultimately hired, testified without dispute that, before recommending that Bowman be hired by the City, he spoke with the three references listed on Bowman's employment application, which included Rufus Lee, the Chief of Police for Ider, Alabama, where Bowman was employed when he was hired by the City; Jim May, a DeKalb County Sheriff's Deputy, in whose department Bowman had previously worked as a jailer; and an individual named Dale Orr, whose identity is otherwise unrevealed in the record. Trotman also stated that he also talked with Randall Smith, a police officer for the City who knew Bowman. While additional investigation might have revealed that Bowman was sanctioned for improperly using pepper spray upon prisoners, it simply cannot be said that Trotman's pre-hire investigation into Bowman's background or his decision to hire Bowman evidenced "deliberate indifference" to the constitutional rights of third parties. Accordingly,

summary judgment will be granted in favor of the City on Plaintiff's section 1983 claim based on the allegedly inadequate screening of Bowman's past and on the decision to hire him.

### b. Training and Supervision

A closer question is presented by Plaintiff's contention that the City is liable under section 1983 for Bowman's alleged use of excessive force based on the City's failure to train and/or supervise him adequately.  The record shows that on the night Plaintiff was arrested, Bowman had been a patrol officer for only about six months, and he was permitted to go out on patrol alone.   This was notwithstanding that Bowman had not yet been certified as a police officer under Alabama law, nor had he attended a police academy, which is a certification requirement. See § 36-21-46, Ala. Code (2000). Bowman had worked as a jailer and a corrections officer with other law enforcement agencies for several years and had been out riding along on assignments with certified police officers on numerous occasions. Bowman acknowledges, though, that while on such "ride-alongs" no one had ever instructed him specifically on how or when to perform a takedown. Bowman had, on the other hand, previously taken a course at the University of Alabama Jail Academy that included instruction on how to perform a takedown when effectuating an arrest.  Otherwise, however, he had received no specialized police training, instructions, classes, or examinations regarding the use of force. Bowman also testified at his deposition that although the City has a manual outlining the policies and procedures of its police department, he could not recall having ever received or read a copy.  He stated that he was unaware whether the City has any policy or procedure on how or when to effectuate a takedown in an

arrest situation, but he indicated that he knew "that you're not supposed to hurt anybody" and that an officer is to use "the least amount of force necessary." Bowman defined his understanding of "excessive force" as "being negligence, doing something that you shouldn't do." Bowman also explained, however, that he had gained such understanding through "common sense," not from reviewing any police policies or procedures.

As with Plaintiff's claims alleging that the City is liable under section 1983 for decisions relating to pre-hiring screening of Bowman's background and to his ultimate hiring, in order for municipal liability to attach, Plaintiff is required to show (1) that the lack of training and/or supervision amounts to "deliberate indifference" on the part of the municipality to Plaintiff's constitutional right to be free from unreasonable force in the course of an arrest and (2) that the lack of adequate training or supervision was the moving force behind the alleged constitutional violation. See Gold v. City of Miami, 151 F.3d at 1350; Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). Ordinarily, to "establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." See id. at 1350-51 and cases cited therein. Here, notwithstanding what might appear to be a paucity of training and supervising measures instituted by the City with regard to its police officers, there is no evidence or even an allegation that the City's policies or procedures, or the lack thereof, have resulted in any prior constitutional violations of the sort alleged by Plaintiff.

But, as stated previously, the Supreme Court has also suggested that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. Harris, 489 U.S. at 390. As an example, the Supreme Court hypothesized that it would be obvious that a municipal police force that is issued firearms must be trained in the constitutional use of deadly force. Id. at n.10.

In the instant circumstances, it is obvious that the officers of a municipal police force, no matter how small, would certainly be faced with recurrent situations where there would be a need to employ force to secure the arrest of citizens. Thus, it is obvious that at least some training in the constitutional use of force in the course of an arrest should be given to police officers. However, Plaintiff admits that in order to become certified, every police officer in the State of Alabama must now attend a police academy where candidates are given instruction in the proper use of force in effectuating an arrest. Nor does Plaintiff dispute that the City has a policy that attempts compliance with that law. Thus, it is far from obvious that every municipality like the City would need its own similar program. Plaintiff also makes much of the fact that the City allowed Plaintiff to become a patrolman without having gone to the police academy. However, such is expressly contemplated by Alabama law, which allows for a 6 month provisional appointment to act as a police officer before attending the police academy and obtaining certification. See § 36-21-46; 650-X-2-.01, Ala. Admin Code. It might indeed be imprudent to allow police officers to go out into the streets

without having been first given at least some minimal instruction or guidance on the constitutional use of force. But given that provisional appointees generally will be given such instruction within a relatively short period of employment, and the lack of any indication of prior constitutional violations, it is simply not so blatantly obvious, so as to give rise to the requisite "deliberate indifference" on the part of the municipality, that such instruction must be given before an officer is permitted to work patrol. The Court would note that allowing Bowman to go on patrol alone to perform substantive law enforcement duties as an uncertified police officer was, in fact, a violation of Alabama law. A provisional appointee, such as Bowman, "involved in patrol operation for the purpose of detection, prevention and suppression of crime or the enforcement of the traffic or highway laws of the state, including exercising the power of arrest [must] be under the direct control and supervision of a certified law enforcement officer." 650-X-2-.01(3)(a)(2), Ala. Admin Code. Nonetheless, the Court concludes that, in the absence of an alleged prior constitutional violation caused by such a policy, it is not so obvious that allowing an officer to go out alone is so certain to result in a constitutional violation such as alleged by Plaintiff that the municipality might be held liable under section 1983. Accordingly, summary judgment will be granted on Plaintiff's section 1983 claims against the City alleging inadequate training and supervision.

### B. The State Law Claims

#### 1. Assault and Battery/ Negligent, Careless, and Unskillful Arrest

Plaintiff claims that both Bowman and the City are liable under Alabama law for assault and battery and also for a "negligent, careless, and unskillful arrest," based upon Bowman's alleged use of excessive force in securing his arrest.

In <u>Wright v. Wright</u>, 654 So.2d 542, 544 (Ala.1995), the Alabama Supreme Court stated:

> This Court has defined "assault" as " 'an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.' " <u>Allen v. Walker</u>, 569 So.2d 350, 351 (Ala. 1990), quoting <u>Western Union Telegraph Co. v. Hill</u>, 25 Ala. App. 540, 542, 150 So. 709, 710, cert. denied, 227 Ala. 469, 150 So. 711 (1933), as quoted in <u>Holcombe v. Whitaker</u>, 294 Ala. 430, 435, 318 So. 2d 289, 294 (1975). A successful assault becomes a battery, which consists of the touching of another in a hostile manner. <u>Surrency v. Harbison</u>, 489 So.2d 1097, 1104 (Ala. 1986), citing <u>Singer Sewing Machine Co. v. Methvin</u>, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).

Under Alabama law, liability for assault and battery may lie, even if one has a legal right to arrest or detain another, where the defendant has used more force than is reasonably necessary to accomplish his purpose of arresting and detaining the plaintiff. <u>Evans v. Walker</u>, 237 Ala. 385, 187 So. 189, 190-91 (1939). Further, the Alabama Supreme Court has stated that, in making an arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest. <u>Franklin v. City of Huntsville</u>, 670 So. 2d 848, 852 (Ala. 1996) (<u>citing</u> § 13A-3-27, Ala. Code).

The Alabama courts have in the past allowed that a municipality may be held liable under § 11-47-190, Ala. Code (2000),[6] for an assault and battery committed by

---

[6]Section 11-47-190 provides:

"No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong

its police officer based upon his use of excessive force.  See Franklin, 670 So. 2d at 852-53; Ellison v. Town of Brookside, 481 So. 2d 890 (Ala. 1985); City of Birmingham v. Thompson, 404 So. 2d 589, 592 (Ala. 1981).   However, in Thompson, the seminal Alabama case discussing the issue, the court explained that a municipality may be held liable under § 11-47-190 for its officer's excessive use of force only where the conduct may be properly characterized as a "negligent assault and battery." 404 So. 2d at 592 (emphasis added).  That is, a municipality may be liable where the amount of force used by the officer is attributable to his "unskillfulness" in that his response is excessive as measured against that of a skilled or proficient officer in similar circumstances.  Id.

However, Bowman and the City both assert that, pursuant to the discretionary function immunity provided by § 6-5-338, Ala. Code (2000),[7] they are

_____

was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways or buildings after the same had been called to the attention of the council or other governing body or after the same had existed for such an unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council or other governing body and whenever the city or town shall be made liable for damages by reason of the unauthorized or wrongful acts or negligence, carelessness or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured.  However, no recovery may be had under any judgment or combination of judgments, whether direct or by way of indemnity under Section 11-47-24, or otherwise, arising out of a single occurrence, against a municipality, and/or any officer or officers, or employee or employees, or agents thereof, in excess of a total  $100,000 per injured person up to a maximum of $300,000 per single occurrence, the limits set out in the provisions of Section 11-93-2 notwithstanding."

[7]Section 6-5-338 provides in pertinent part as follows:
"(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution orlaws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the

entitled to prevail on Plaintiff's state law claims alleging assault and battery and negligent, careless, or unskillful arrest. In 1994, the Alabama legislature granted statutory immunity from tort liability to municipal police officers for "conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." § 6-5-338(a). Such immunity "shields [an] employee from liability if the employee is engaged in a discretionary act, instead of a ministerial one, when the alleged tortious conduct occurs." McDonough v. Parker, ___ So. 2d ___, ___, 2000 WL 1006952, *2 (Ala. 2000) (quoting Ex parte Alabama Dep't of Forensic Sciences, 709 So. 2d 455, 458 (Ala.1997). "Discretionary acts have been defined as those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Wright v. Wynn, 682 So. 2d 1, 2 (Ala. 1996). " 'Ministerial acts,' on the other hand, are those acts 'done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.' " McDonough, supra (quoting Carroll v. Hammett, 744 So. 2d 906, 910 (Ala. 1999).

---

enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

"(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours."

Actions by an officer in executing an arrest are generally considered discretionary functions for purposes of § 6-5-338.  See Wright, 682 So. 2d at 2; Ex parte City of Montgomery, 758 So. 2d 565, 569-71 (Ala. 1999); Sheth v. Webster, 145 F.3d 1231, 1238-39 (11th Cir. 1998).

However, also exempted from the coverage of the immunity provided by § 6-5-338 is conduct by a police officer that is "so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." Couch v. City of Sheffield, 708 So. 2d 144, 153 (Ala. 1998).  Thus, in the absence of sufficient proof indicating that an officer acted with malice or in bad faith in making or carrying out an arrest, the immunity of §6-5-338 shields him from tort liability.  See Wright, supra; Ex parte City of Montgomery, 758 So. 2d at 569-71; Sheth, 145 F.3d at 1238-39. Further, section 6-5-338(b) provides that the immunity afforded to individual officers under subsection (a) is also "intended to extend . . . to . . . governmental units or agencies authorized to appoint peace officers." See McDonough v. Parker, ___ So. 2d ___, ___, 2000 WL 1006952, *4 (Ala. 2000);  Montgomery v. City of Montgomery, 732 So. 2d 305, 312 (Ala. Civ. App. 1999); Hardy, 50 F.Supp. 2d at 1200.  Therefore, discretionary function immunity shields both Bowman and the City from tort liability except to the extent that Bowman's alleged use of excessive force could reasonably be said to have been willful or malicious conduct or conduct engaged in bad faith. See Wright, supra.

The foregoing discussion shows that Plaintiff may not maintain his claims for a "negligent, unskillful, and careless arrest" against either Bowman or the City. Such claims necessarily implicate  only negligent conduct, a culpable mental state far below the willful, malicious, or bad faith conduct which must be shown to avoid

the scope of immunity conferred by § 6-5-338 upon officers making and carrying out arrests. <u>See generally</u> <u>Deviner v. Electrolux Motor, AB</u>, 844 F.2d 769, 773 (11th Cir. 1988) (discussing the distinctions under Alabama law between the mental states associated with negligent, wanton, and intentional misconduct). Accordingly, summary judgment will be granted in favor of Bowman and the City on Plaintiff's claims alleging negligent, unskillful, and careless arrest.

However, there is still the matter of Plaintiff's claims for assault and battery against Bowman and the City. As stated above, § 6-5-338 shields both Bowman and the City from tort liability, including for assault and battery, except to the extent that Bowman's alleged use of excessive force in arresting Plaintiff could reasonably be said to have been willful or malicious conduct or conduct engaged in bad faith. Because the Fourth Amendment and Alabama tort law both assess the appropriateness of an officer's use of force by asking whether he acted reasonably in making the arrest, <u>cf.</u> <u>Hancock v. Hobbs</u>, 967 F.2d 462, 468 (11th Cir. 1992) (holding that federal and Georgia law both evaluate the use of force in making an arrest using a reasonableness standard), it follows from the Court's conclusion that there is sufficient evidence to show a violation of Plaintiff's Fourth Amendment rights that there is also sufficient evidence to find that Bowman used unreasonable force for purposes of assault and battery claims under Alabama law. Bowman and the City contend, however, that there is insufficient evidence to characterize Bowman's alleged use of force as willful or malicious conduct or conduct engaged in bad faith. The Court disagrees.

The evidence favorable to Plaintiff, if credited, suggests that Bowman grabbed Plaintiff and slung him to the ground causing serious injuries requiring medical

treatment, and that Bowman did so for no apparent reason other than perhaps to exert gratuitous force upon an arrestee. Such is enough for a jury reasonably to find that Bowman's use of force against Plaintiff was malicious and done in bad faith. Thus, § 6-5-338 does not wholly immunize either Bowman or the City from liability on Plaintiff's claims against them for assault and battery. See Wright, supra. And because neither the City nor Bowman identifies in its motion or brief any additional ground or immunity warranting granting summary judgment on Plaintiff's assault and battery claims, the Court will deny the Defendants' motion as it pertains to said claims.[8] However, in order to prevail on such claims, Plaintiff will have to prove not only that Bowman employed unreasonable force in securing his arrest, but also that Bowman's use of force was so egregious as to constitute willful and malicious conduct done in bad faith.

### 2.   Negligent Hiring, Training, and Supervision

Plaintiff further alleges that the City is liable under Alabama law because its agents or employees negligently hired, trained, and supervised Bowman, which ostensibly resulted in Bowman's use of excessive force against Plaintiff. However, the record indicates that the pre-hiring screening of Bowman's background and the the post-hiring training and supervising decisions relating to Bowman were made by the then-police chief, Robert Trotman. The Court agrees with the City that such decisions and actions fall within the scope of his discretionary function immunity as a law enforcement officer under § 6-5-338. See Richards v. Southeast

---

[8]There may perhaps be other legal grounds by which the City might escape liability for tort claims based on the alleged willful, malicious, and bad faith infliction of injury committed by Bowman. However, the state has argued that it is immune from liability based only on § 6-5-338.

Alabama Youth Services Diversion Center, 105 F.Supp. 2d 1268, 1282 (M.D. Ala. 2000) (holding that claims of negligent training and supervision of a police officer were barred by discretionary function immunity); Hardy v. Town of Hayneville, 50 F.Supp. 2d 1176, 1195, 1202-03 (M.D. Ala. 1999) (holding that the plaintiff's claim for negligent hiring based on the actions of the municipal defendant's chief of police were within scope of discretionary function immunity).  Plaintiff has not shown or alleged that any of Trotman's decisions regarding Bowman's hiring, training, or supervision was so egregious that it amounted to willful or malicious conduct or bad faith.  Trotman's discretionary function immunity extends to the City.  Section 6-5-338(b).  Accordingly, summary judgment will be granted for the City on Plaintiff's state law claims of negligent hiring, training, and supervision.

## IV.  CONCLUSION

Because Plaintiff has conceded all of his claims against Defendant Blackwell, that Defendant's "revised" motion for summary judgment (Doc. No. 49) is due to be GRANTED, and all claims against him are due to be dismissed.  Defendant Blackwell's original motion for summary judgment (Doc. No. 40) is MOOT.  The motion for summary judgment filed jointly by the Defendant City and Defendant Bowman (Doc. No. 39) is due to be GRANTED IN PART AND DENIED IN PART.  Said motion is due to be GRANTED **except** insofar as it seeks the dismissal of the following claims:

(1)    Plaintiff's section 1983 claim against Bowman alleging excessive force; and

(2)    Plaintiff's state law claims against Bowman and the City for assault and battery

As to such claims, the motion filed by the City and Bowman is due to DENIED.

All other claims against the Defendants are due to be dismissed, as the Court has concluded that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on such other claims. A separate order will be entered.

**IT IS SO ORDERED**, this _9th_ day of February, 2001,


_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE